IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW R. WASSAM, | ) | Case No. 5:21-CV-01695 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Matthew R. Wassam, seeks judicial review of the final decision of the

Commissioner of Social Security, denying his applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  Wassam challenges the Administrative Law Judge's ("ALJ") negative findings, contending

that the ALJ erred in finding the opinions of Drs. Vogelgsang and Pakeeree unpersuasive.

Because the ALJ applied proper legal standards and reached a decision supported by substantial

evidence, I recommend that the Commissioner's final decision denying Wassam's applications

for DIB and SSI be affirmed.

**I.      Procedural History**

Wassam applied for SSI and DIB on May 3, 2019.  (Tr. 209-216).[2]  He alleged that he

became disabled on January 18, 2015, due to: (1) arthritis in his ankle, (2) an issue with his left

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).
[2] The administrative transcript appears at ECF Doc. 9.

knee, (3) post-traumatic stress disorder ("PTSD"), (4) bipolar disorder, (5) obsessive-compulsive disorder ("OCD"), (6) insomnia, and (7) "spasms."  (Tr. 242, 250).  The SSA denied Wassam's applications initially and upon reconsideration.  (Tr. 67-83, 86-99).

ALJ Amanda Knapp heard Wassam's case on July 15, 2020 and denied the claim in a September 28, 2020 decision.  (Tr. 12-49, 119-130).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Wassam had the residual functional capacity ("RFC") to perform light work, except that:

> [Wassam] can frequently operate foot controls with the right lower extremity; he can frequently climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; he can frequently kneel, crouch, or crawl; he must avoid all exposure to workplace hazards such as unprotected heights, moving mechanical parts, or commercial driving; he can perform simple, routine tasks, but not at a production rate pace, and not with strict production quotas; he can interact occasionally with others, with no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others; and he can adapt to occasional changes in the work setting or routine, so long as those changes are explained in advance and implemented gradually.

(Tr. 124).  Based on vocational expert testimony that a hypothetical individual with Wassam's age, experience, and RFC could work in such available positions as an office helper, stock checker, or a mail clerk, the ALJ determined Wassam was not disabled.  (Tr. 129-130).  On July 26, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  And on August 31, 2021, Wassam filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Wassam was born on November 29, 1980 and was 34 years old on the alleged onset date. (Tr. 250).  He had graduated from high school, completed two years of college, and had past work at a convenience store and as a surgical technician at a hospital.  (Tr. 243).

### B.     Relevant Medical Evidence

#### 1.     Physical Medical Evidence

From January 18 to January 29, 2015, Wassam was hospitalized following a motor vehicle accident.  (Tr. 852).  He was diagnosed with a hemorrhage, bilateral ankle fractures, a right fifth rib fracture, and a femur fracture.  (Tr. 852-853).  Wassam underwent four surgeries for his factures and was discharged into a rehabilitation facility.  *Id*.

On March 9, 2015, as a follow-up from his car accident, Wassam had imaging done on his cervical spine, which indicate that he had good range of motion and no fractures or subluxation.  (Tr. 1585).  Imaging of his brain indicated that he had two subdural hematomas on his right side.  (Tr. 1586-1588).

On April 14, 2015, Wassam had an appointment with Falls Family Practice to transition his care following his car accident.  (Tr. 1513).  On physical examination, he was generally normal except that his ankles and femur were sore.  (Tr. 1514).

On December 25, 2015, while incarcerated,[3] Wassam requested to be seen at the prison's medical unit for severe pain in his right ankle joint; muscle tightness, soreness, and fatigue in his lower right extremity; hypertrophy at the base of his leg and top of his right foot; and difficulty walking, having a noticeable limp on his right side.  (Tr. 1015).  He noted that the pain disrupted his ability to walk, dress, and sleep.  *Id.*  He was seen on December 30, 2015.  *Id.*

From January 18, 2016 to October 24, 2017, Wassam was treated by the prison's medical unit.  (*See* Tr. 433, 472, 515-516, 527-528, 532, 538-539, 558-561, 602-605, 615-616, 668, 1009).  He routinely expressed concerns about his ankles and chronic pain stemming from them, which was aggravated with movement.  (Tr. 433, 472, 515, 527, 538, 558, 561, 604, 616, 1009).

---

[3] Wassam was convicted for aggravated vehicular assault, based on his car accident in January 2015.  (*See* Tr. 1041).

And physical examinations often noted tenderness, a limited range of motion in his legs, or a slight limp.  (Tr. 528, 532, 538, 558-559, 668).  In February 2016, he was diagnosed with arthritis in his ankles, and later imaging confirmed localized osteoarthrosis.  (Tr. 602-603, 668).  An x-ray in November 2016 also identified tenosynovitis in his foot and ankle.  (Tr. 528).  As treatment, Wassam underwent an orthopedic consultation and was prescribed pain medication and given a compression sleeve.  (Tr. 434, 472, 528, 538-539).

On January 7, 2019, after being released from prison, Wassam saw Jeffery Junko, M.D., reporting pain in his right heel and the top of his foot.  (Tr. 1375).  On examination, Dr. Junko noted that Wassam was alert and orientated, was able to verbalize normally, and had a good understanding of his situation.  (Tr. 1377).  He observed that Wassam's foot was, generally, normal but the medial malleolus was more prominent, and his posterior tibial tendon was mildly tender to palpation.  (Tr. 1378).  He noted that Wassam could walk with a mild limp, stand unassisted, and maintain his balance.  *Id.*  Dr. Junko also took x-rays of Wassam's foot and noted that he had severe arthritis.  (Tr. 1381).  He prescribed an ankle brace and discussed a possible injection to help with the pain.  (Tr. 1382).

On February 1, 2019, Wassam was seen by Nilesh Shah, M.D., reporting right ankle pain and a gait problem.  (Tr. 1370, 1372).  He was given a steroid injection and reported that he felt better walking.  (Tr. 1372-1373).

On July 22, 2019, Wassam had x-rays taken of his right ankle, which indicated he had post-operative changes and osteoarthrosis, but not acute osseous abnormality.  (Tr. 1363).

On August 14, 2019, Wassam had an appointment with Scott Higley, D.O., regarding the arthritis in his ankle, which was confirmed on physical examination.  (Tr. 1390-1391).  Wassam was instructed to consult a pain management specialist.  (Tr. 1391).

4

On August 21, 2019, Wassam saw Dr. Junko, complaining of right ankle pain and restless leg syndrome.  (Tr. 1364).  On examination, Wassam's right leg and ankle were generally normal, but his ankle was tender to palpation and had decreased range of motion. (Tr. 1367-1368).  Dr. Junko also observed that Wassam was able to walk with a normal gait, stand unassisted, and maintain his balance.  (Tr. 1368).  He explained that Wassam's leg symptoms were more likely muscle spasms from his gait abnormality, referred Wassam for physical therapy, and instructed him to continue using his ankle brace.  (Tr. 1369).

From September 4, 2019 to April 13, 2020, Wassam saw Katherine Guran, M.D., regarding his right ankle pain.  (Tr. 1520, 1526, 1534, 1619).  He initially described his pain as a 7 out of 10, shooting, achy, and aggravated by standing, and climbing stairs.  (Tr. 1520-1524, 1526-1529, 1534).  On physical examination, he had joint pain, swelling, stiffness, restricted movement, and muscle weakness.  (Tr. 1521, 1523, 1529, 1536).  During his first visit, he had an x-ray on his right ankle joint, which indicated he had severe post-traumatic osteoarthritis. (Tr. 1544-1545).  Dr. Guran initially prescribed medication and later added a topical pain relief cream; the use of injections was also discussed.  (Tr. 1524, 1529, 1536).  During his second to last visit, Dr. Guran noted that Wassam walked with an antalgic gait, but on his last exam he had a normal gait with mild swelling.  (Tr. 1536, 1620).  In these appointments, Wassam reported experiencing some relief from the medication and topical cream.  (Tr. 1534, 1619).

From December 1 to December 3, 2019, Wassam was hospitalized for a seizure. (Tr. 1466-1510).  While there, Wassam had an episode of bradycardia, a cardiologist consulted on his condition and recommended he wear a monitor and have an outpatient follow-up. (Tr. 1466).  Wassam was also found to have aspiration pneumonia and was treated and discharged with medication.  *Id.*

5

On January 2, 2020, Wassam saw Dr. Higley for a follow-up after his seizure. (Tr. 1531).  On physical examination, he was noted as being normal.  (Tr. 1532).

### 2. Mental Health Medical Evidence

Due to the nature of Wassam's mental health conditions, some records from before his alleged onset date have been included for context.

In July and August 2014, Wassam was hospitalized for suicidal ideations, once for contemplating destroying his home with a sledgehammer and once for an intentional drug overdose.  (Tr. 317-318, 325).

On January 20, 2015, while Wassam was hospitalized after the car accident, he underwent a mental health evaluation.  (Tr. 789).  He was observed to speak normally and have appropriate language and eye contact; an "okay" mood with congruent affect; a linear, goal-directed thought process; normal thought content; intact cognition, memory, and attention; and fair insight and judgment.  *Id*.  Wassam's medication was continued.  (Tr. 790).

On September 25, 2015, Wassam was admitted to St. Thomas Hospital for an attempted suicide by asphyxiation with carbon monoxide, which he denied occurred.  (Tr. 348).  After three days, he was diagnosed with a mood disorder, rule-out bipolar disorder, anxiety disorder, rule-out PTSD, rule-out OCD, and alcohol dependency, and was discharged in stable condition. (Tr. 349).

On December 22, 2015, during his incarceration, Wassam was seen by the prison's medical clinic, reporting anxiety with suicidal ideation.  (Tr. 670).  He was reassured during his assessment, moved housing units, and watched for five days.  (Tr. 670, 1068, 1085-1087). Following his removal from crisis watch, Wassam was noted as adjusting and progressively

becoming more upbeat with no inclination to self-harm.  (Tr.  1089, 1090-1094, 1096).  His own reports indicated the same.  *Id.*

On January 13, 2016, Wassam underwent a biopsychosocial assessment. (Tr. 1043-1046).  He reported being diagnosed with bipolar, PTSD, and OCD, and that he had previously been hospitalized four times for suicidal ideation or attempts and once for a manic episode.  (Tr. 1043).  It was noted that his current conviction stemmed from his 2015 car accident, at which time he had stated it was a suicide attempt, but at the assessment he denied such efforts.  *Id.*  He reported having good concentration and the ability to focus on small tasks. *Id.*  It was observed that he appeared to have some anxiety as he struggled to sit still in his chair. *Id.*  His overall hygiene and grooming were good; his attention and concentration were intact; he was alert, oriented, calm, and cooperative; and he maintained adequate eye contract.  *Id.*  He was also observed to have no looseness of association in his thought content.  *Id.*  He reported that his anxiety caused him to sleep only about five hours a day.  *Id.*

On January 20, 2016, Wassam underwent an additional mental health examination. (Tr. 1040).  He reported being previously sexually abused, and that he usually controlled his chronic suicidal ideations, and had periods of inappropriate or intense anger, sleep disturbances, and increased anxiety since he was incarcerated.  (Tr. 1041).  The therapist noted that he appeared well-groomed and dressed appropriately.  (Tr. 1040).  The therapist observed that his speech was normal in tone, rate, and volume; his mood was euthymic with a fair range of affect; he had a normal thought process and logical and goal-orientated thought content; and he was alert, orientated, and attentive.  *Id.*  He denied having any difficulty concentrating and he had an intact memory, fair insight, and intact judgment.  *Id.*  In addition to his earlier diagnosis of

bipolar disorder, the therapist noted that he had or demonstrated symptoms of persistent depressive disorder, alcohol use disorder, and borderline personality traits.  (Tr. 1042).

On February 17, 2016, Wassam had a therapy session that he found helpful.  (Tr. 1067).

On March 7, 2016, Wassam had a mental health encounter, during which he reported his history of OCD, PTSD, bipolar, and suicide attempts, and noted that he currently experienced mood swings, nightmares, and depressive episodes.  (Tr. 607).  He was observed to be kempt, in a stable mood with congruent affect, organized in his thinking, verbal, and responsive to questions.  *Id.*  He was assessed with symptoms of anxiety and depression.  *Id.*  The same day, Wassam also met with a psychiatrist.  (Tr. 609).  Wassam provided his mental health history and the psychiatrist generally made the same observations, noting his speech was normal, his mood was slightly anxious, his affect was incongruent with his thought content, and he was "obsessed with death."  (Tr. 609-610).  The psychiatrist changed his medications' dosages and assessed Wassam with bipolar disorder, PTSD, and alcohol use disorder.  (Tr. 611).

From March 23, 2016 to December 9, 2018, Wassam received mental health treatment through his prison facility.  (*See* Tr. 359-600).  Initially, he saw a therapist about twice a month, which was later reduced to once a month, and a psychiatrist about once every four to six months. *Id.*  Generally, Wassam reported being in a stable mood with his anxiety or depression symptoms ranging from a 4 to 7 out of 10 (with 10 being the best).  (*See e.g.*, 370, 378, 405, 424, 440, 459, 489, 494, 509, 521, 536, 552, 571).  Wassam routinely reported pain from his ankles that kept him up at night or made it difficult for him to walk.  (*See e.g.*, Tr. 456, 505, 509, 511, 521, 525, 536, 548, 564).  Wassam would also occasionally indicate bouts of depression, sometimes accompanied with increased suicidal ideation, that typically coincided with prison incidents (*e.g.*, an assault or being found with prohibited medication), developments in his custody case with his

ex-wife, or other situational stressors.  (*See* Tr. 408, 418, 466, 487, 498, 595, 600).  He spent his days reading, watching televisions, or doing puzzles.  (*See* Tr. 359-600).

During Wassam's sessions, the therapist or psychiatrist generally made the same observations, consistently noting that Wassam was cooperative, walked with a limp, and had a stable/euthymic/bright mood with reactive or congruent affect, linear or logical thought processes, and thought content focused on his custody dispute or pain.  (*See* Tr. 359-600).  They also observed that Wassam's sensorium and cognition were intact, he had good or fair insight and judgment, made fair eye contract, and had good hygiene.  *Id.*  Wassam was consistently assessed with persistent depressive disorder, borderline personality disorder, alcohol use, unspecified bipolar and related disorder, and PTSD.  *Id.*

On December 27, 2018 to August 20, 2019, following his release, Wassam saw R. Pakeeree, M.D., for mental health treatment.  (Tr. 1345-1349, 1414).  On his initial evaluation, following his release from prison, Wassam reported that his symptoms including insomnia, depression, and a lack of motivation.  (Tr. 1345).  On examination, Dr. Pakeeree noted that Wassam's mood and affect were mildly depressed but appropriate; his conversation was coherent and relevant; he did not have any delusions, hallucinations, or suicidal ideations; his concentration and attention span were good; his general knowledge was adequate; he had no memory impairment; he was oriented; and his insight and judgment were good.  (Tr. 1346).  His subsequent appointments included similar reports and observations, and Dr. Pakeeree diagnosed Wassam with bipolar disorder.  (Tr. 1348-1349, 1414).

On September 9, September 26, and October 7, 2019, Wassam met with licensed professional counselor Olivia Perna, LPC, for additional mental health counseling. (Tr. 1420-1444).  During his initial examination, Wassam reported having difficulty sleeping,

worrying, irritability, depressed feelings, fatigue/loss of energy, loss of interest in activities, and low self-esteem.  (Tr. 1420).  He indicated that legal proceedings with his ex-wife stressed him out and he spent his time reading, playing videogames, and woodworking.  (Tr. 1424).  Based on his reported symptoms, Perna diagnosed Wassam with a generalized anxiety disorder and persistent depressive disorder.  (Tr. 1425-1426).  She noted that his bipolar symptoms would continue to be monitored.  (Tr. 1426).  In his subsequent session, Perna's observations of Wassam's behavior were consistent with those of Dr. Pakeeree (*see* Tr. 1442-1443), and Wassam was discharged but encouraged to continue with individual counseling.  (Tr. 1444).

On October 8, 2019, Wassam saw Dr. Pakeeree and reported that his mood was okay, he had not had highs or lows, and he did not have any suicidal ideation.  (Tr. 1415).  He also reported that his sleeping pill was not helping.  *Id.*  Dr. Pakeeree observed that Wassam's mood and affect were appropriate, and he did not have any delusions, hallucinations, or evidence of dangerousness.  *Id.*  His diagnosis remained unchanged.  *Id.*

On October 9, October 23, and November 11, 2019, Wassam returned to Perna. (Tr. 1447-1449).  He indicated that he was doing relatively well, but Perna indicated he made minimal progress towards his goal of enhancing his ability to cope with life's anxieties.  *Id.*

On December 9, 2019, Wassam saw Dr. Pakeeree and reported that he had not had highs or lows in his mood.  (Tr. 1461).  Dr. Pakeeree observed that Wassam's mood and affect were appropriate, he did not have mental disturbances or evidence of dangerousness, and Dr. Pakeeree maintained his bipolar disorder diagnosis.  *Id.*

From December 10, 2019 to April 13, 2020, Wassam met with Perna five times. (Tr. 1450-1456).  Wassam reported varying anxiety levels and often expressed frustration with the custody dispute.  *Id.*  Perna reported that he made minimal progress toward his goal.  *Id.*

10

On March 2, 2020, Wassam met with Dr. Pakeeree, reporting continued difficulty sleeping but a stable mood.  (Tr. 1460).  Dr. Pakeeree observed that his mood and affect were appropriate, and Wassam did not have mental disturbances or evidence of dangerousness; he maintained his bipolar disorder diagnosis.  *Id.*

On May 11, 2020, Wassam saw Perna.  (Tr. 1440).  He reported that he had little interest or pleasure in doing things more than half of the days; felt down, depressed, or helpless several days; had a poor appetite nearly every day, he did not feel bad about himself; he had trouble concentrating more than half the days; he did not noticeably move or speak slowly; and he did not think he would be better off dead or harming himself.  *Id.*  He indicated that these problems made it difficult to do work, take care of his home, or get along with others.  (Tr. 1440-1441).

On May 26, 2020, Wassam met with Dr. Pakeeree and reported that he did not feel any highs or lows but had pain in both of his ankles.  (Tr. 1459).  Dr. Pakeeree assessed that Wassam was relatively stable and advised him to maintain his medication.  *Id.*

## C.      Relevant Opinion Evidence

### 1.      Function Report – Matthew Wassam

On May 16, 2019, Wassam completed a function report.  (Tr. 253-260).  He stated that his ankle had collapsed, causing arthritic growth in the joint that affected his ability to walk, climb stairs, lift weights, stand, and his daily activities generally.  (Tr. 253).  He also stated that he experienced cramps and spasms in his legs, which impacted his sleep, and he suffered from bipolar disorder and anxiety.  *Id*.  On the average day, he explained that he tried to do household chores, but laundry and general cleaning were difficulty because of his decreased movement.  (Tr. 254).  He also stated that he tried to read in small amounts, but he had trouble focusing and his medication made him sleepy and groggy.  *Id.*  His conditions prevented him from walking,

11

climbing stairs, bathing, or anything that require movement. *Id.* They also impacted his sleep because he had severe cramps and difficulty getting and staying asleep. *Id.* These difficulties were also reflected in his personal care, as he struggled to put on his pants and socks, bathe, and sit or stand to use the toilet. *Id.* He did not need reminders to take his medication, but he used a pill box to help him. (Tr. 255). He prepared his own microwavable or frozen meals, did laundry, and loaded the dishwasher, although laundry "takes hours" because of his pain when climbing stairs. *Id.* He needed encouragement to do these chores and had gotten help with carrying things and removing trash. *Id.* He has not tried to work outside. (Tr. 256).

Wassam would go outside once or twice a week and he would walk or ride in a car. *Id.* He did not drive because of his ankle injury. *Id.* His family would do his grocery shopping for him. *Id.* He could handle his own finances. *Id.* His hobbies included reading, watching television, kakuro, and coloring, but he had issues focusing on a daily basis. (Tr. 257). He also reported being isolated and rarely doing things with others, but he would go to the corner store (three blocks away) about twice a week. *Id.* His bipolar disorder caused him to be agitated with others and he would have anxiety about interacting with other people. (Tr. 258).

Wassam reported that his conditions affected his ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember things, complete tasks, concentrate, and get along with others. *Id.* He noted that movement-related activities could be painful, and his mental health medication changed, which caused him difficulty concentrating. *Id.* He also noted that a head injury caused him to have memory issues. *Id.* He stated that he could walk less than a mile before needing to rest, he could pay attention for "maybe" an hour, and he could not finish what he started. *Id.* He also was average in following written instructions, easily forgot oral instructions, and did not have problems getting along with authority figures. (Tr. 258-259). He

12

reported that how he handled stress depended on what was causing the stress because most of the time he handled it well, but he could "explode" verbally or physically.  (Tr. 259).  He also noted that he was prescribed an ankle brace.  *Id.*

### 2. Physical Health Opinions

#### a. Consultative Examination – Mark Vogelgsang, M.D.

On July 22, 2019, Wassam underwent a consultative examination with Mark Vogelgsang, M.D., regarding his bipolar disorder and right ankle pain.  (Tr. 1352-1357).  Wassam reported being first diagnosed with bipolar disorder in 2014 and that his current medications were very helpful.  (Tr. 1352).  He described his depression symptoms as decreased motivation, some anger problems, a dislike of leaving the house, and manic episodes with increased talking.  *Id.*  He also explained the history of his ankle pain, his diagnosis of osteoarthritis, and that he had received a steroid shot, which did not work, and used an ankle brace.  (Tr. 1352-1353).  He expressed concerns that his left ankle may be developing osteoarthritis.  (Tr. 1353)*.*  He indicated his right ankle pain was 7 out of 10 and caused him difficulty carrying objects up the stairs, walking long distances, and his right toes would occasionally catch.  *Id*.

Dr. Vogelgsang observed that Wassam did not use a mobility device, had good balance, and reported that he could sit for hours, stand for about 30 to 60 minutes before having right ankle pain, walk about 4 blocks before having pain, and could carry and lift about 25 pounds.  *Id.*  Wassam reported that he could dress himself, cook, clean, and use the restroom, although during some of the activities he took longer or needed breaks because of his ankle pain.  (Tr. 1354).

Dr. Vogelgsang observed that Wassam was obese, oriented, and had mild difficulty getting on to the exam table because of his right ankle tenderness.  *Id.*  Based on manual muscle testing, Wassam had good range of motion across his joints, except for his right ankle, which had

decreased flexion.  (Tr. 1355, 1358-1361).  There were no signs of joint changes, fluid, edema, or inflammation on either ankle.  (Tr. 1355).  He observed that Wassam walked with a slight limp favoring his right ankle but was able to walk heel to toe with some difficulty from his right ankle.  *Id.*  Otherwise, Wassam was normal.  (*See* Tr. 1354-1355).  Dr. Vogelgsang's impression was that Wassam was obese, had right ankle pain, and had a "history of bipolar."  (Tr. 1355).

Dr. Vogelgsang opined that Wassam, "would probably benefit from having a mental evaluation," but his mental condition "appears to be fairly well controlled," under his medication.  (Tr. 1356).  Dr. Vogelsang also stated, "Possibly since the claimant has stopped drinking it may be that his mental status has improved."  *Id.*  He indicated that Wassam should consult with his surgeon about the next steps regarding his ankle, but that in his current state, he would "probably" have a difficult time doing steps, standing, or walking for an extended length of time.  *Id.*  He opined that Wassam "may be able" to do a sedentary job with occasional walking.  *Id.*

### b.    State Agency Consultants

On August 19, 2019, Michael Lehv, M.D., reviewed the medical evidence to evaluate Wassam's physical limitations.  (Tr. 61-64).  Dr. Lehv found that Wassam could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, walk, or sit 6 hours in an 8-hour workday; and was limited in pushing or pulling with his right leg because of his ankle. (Tr. 61-62).  He also found that Wassam could frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; was unlimited in his balancing and stooping; and could frequently kneel, crouch, and crawl.  (Tr. 62).  Wassam was also limited to avoiding all exposure to hazards.  (Tr. 63).  On January 8, 2020, Anton Freihofner, M.D., reconsidered Wassam's physical limitations and affirmed Dr. Lehv's findings.  (Tr. 94-97).

14

### 3.    Mental Health Opinions

#### a.    Mental Health Evaluation – R. Pakeeree, M.D.

Around May 16, 2019, Dr. Pakeeree completed a mental health evaluation. (Tr. 1339-1341).  He stated that he had seen Wassam from September 22, 2018 to March 4, 2019 and had diagnosed him with bipolar affective disorder.  (Tr. 1339).  Dr. Pakeeree reported that Wassam had a history of mood disorders, that were predominantly depressive episodes with exacerbation of at least one hypomanic/manic episode five years prior.  *Id.*  He also indicated Wassam had a history of alcohol use, but he had been sober for over three years.  *Id.*  During his treatment, Dr. Pakeeree found that, when Wassam relapsed, he had depressive episodes and suicide attempts.  *Id.*  Dr. Pakeeree noted that Wassam had a history of property destruction when manic and had previously been imprisoned for driving under the influence when in one of these mental states.  *Id.*  Thus far, he had treated Wassam with mood stabilizing medication and Wassam's response was "satisfactory."  (Tr. 1340).  In his opinion, Wassam's severe mood disorder and multiple personality relapses barred his ability to perform sustained work.  *Id.*

#### b.    Residual Functional Capacity Assessment – R. Pakeeree, M.D.

On July 18, 2020, Dr. Pakeeree completed a residual functional capacity assessment. (Tr. 1624-1628).  He found that Wassam could (i) consistently perform during a regular occupation, if there were little changes in the work environment; (ii) complete simple tasks without any strict production quotas; and (iii) handle low work stress.  (Tr. 1624).  But Wassam could not: (i) handle work involving confrontation, arbitration, negotiation; (ii) handle strict time limits for completing tasks; (iii) be responsible for the health, safety, or welfare of others; (iv) supervise or manage others; (v) influence others; and (vi) travel, drive, or deliver for work. *Id.*  He could also not interact with the public, co-workers, and supervisors.  *Id.*  He would

require extra reminders or assistance to perform work tasks and have issues responding appropriately to normal work criticism on a weekly basis.  *Id.*  Dr. Pakeeree explained that "[w]ith [the] patient's disability, i.e. Bipolar disorder, and with the physical problems that patient has, e.g. chronic pain e.g. in ankles, and [] multiple psych meds that the patient is on, I do not feel that the patient can withstand the stress of the work environmen[t]."  *Id.*

Dr. Pakeeree also explained that Wassam had a depressed mood, diminished interest in almost all activities, sleep disturbances, observable psychomotor agitation or retardation, decreased energy, and thoughts of death or suicide, distractibility, and involvement in activities that have a high probability of painful consequences that are not recognized.  (Tr. 1625)  He further found that Wassam had marked limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself.  *Id.*  He noted that Wassam had evidence that medical treatment or a highly structured setting diminished his symptoms, and he had a minimal capacity to adapt to changes in his environment.  *Id.*

As to his anxiety, Dr. Pakeeree identified that Wassam's disorder was characterized by irritability and sleep disturbances and he had extreme or marked limitations across all of the areas of mental health functioning.  (Tr. 1626)  He also identified that Wassam had the same diminishment of his anxiety in highly structured setting and minimal capacity to adjust as earlier.  *Id.*  Similarly, as to trauma and stress-related disorders, Dr. Pakeeree identified that Wassam had medical documentation of exposure to actual or threatened death, noting Wassam's prior suicide attempt, and disturbance in his mood or behavior.  (Tr. 1627)  He found that Wassam had extreme or marked limitations in three of the four areas of mental health functioning and the same structural diminishment in his symptoms and inability to adapt.  *Id.*  Based on his findings,

Dr. Pakeeree opined that Wassam's impairments medically equaled the severity of conditions described above.  *Id.*  He noted that Wassam had a long-standing history of bipolar disorder and was on mood stabilizers, but was unable to function in a work environment and, in the past five years, had psychiatric hospitalizations and suicide attempts.  *Id.*  Further, Dr. Pakeeree opined that Wassam would be absent three or more times a month due to his impairments or treatment. (Tr. 1628).  Wassam would also be off task more than 15 percent of the time.  *Id.*

**c.**     **State Agency Consultants**

On September 5, 2019, Kristen Haskins, Psy.D., reviewed Wassam's mental health records to determine his possible limitations.  (Tr. 59-60).  She found that he was not limited in his ability to understand, remember, or apply information and had only mild limitations across the other three areas of mental functioning.  (Tr. 59).  On January 2, 2020, Karla Delcour, Ph.D., reconsidered Wassam's limitations and agreed with Dr. Haskins's findings, except she found that Wassam had moderate limitations in his ability to concentrate, persist, or maintain pace, and in adapting or managing himself.  (Tr. 92-93).

**D.**     **Relevant Testimonial Evidence**

Wassam testified at the hearing.  (Tr. 20-41).  He lived with his grandmother, received Medicaid, and did not have a driver's license.  (Tr. 20-21).  He would walk to the store, which was about a four-block walk round-trip, but his parents drove him if he needed to go anywhere farther.  (Tr. 21).  He had an associate degree in surgical technology, but he did not work. (Tr. 22).  In exchange for helping his grandmother for about the past seven months, he was able to live with her and he help her with grocery shopping, taking her medication, and preparing meals.  (Tr. 22-23).  Because his grandmother had Alzheimer's, he was there largely as a safety measure.  (Tr. 23).  Wassam confirmed that he had previously worked as a surgical technician

17

from 2010 to 2015 and, in that role, lifted or carried 40 to 50 pounds.  (Tr. 24).  He also testified
that he previously worked part-time as a convenience store cashier, part-time for a home
healthcare company, and full-time as a lab technician.  (Tr. 24-26).

Wassam believed he could not work because of his mental health; he had a mental break
down when he was in an accident, and the accident caused his mental state to decline, resulting
in his medication dosages increasing and him having to be institutionalized for a period.
(Tr. 27).  He explained that, since 2015, he had struggled with his bipolar disorder, having manic
episodes, and becoming extremely depressed.  (Tr. 28).  Prior to his alleged onset date, he was
living with his grandmother and, although his condition was controlled, he would be in bed most
of the week, had low motivation, and was semi-suicidal.  *Id.*  Now, he was stable, but it required
management and more medication.  *Id.*  He worried that his physical limitations would create
stress in maintaining his job and harm his mental health.  (Tr. 28-29).  He also struggled to be
around people and his manic episodes caused him to have anger issues, noting one occasion
when he threw a computer out of a window.  (Tr. 29).

Wassam testified that he had been experiencing a manic episode the past couple of days,
and it caused him to not sleep for more than two hours at a time and have racing thoughts.
(Tr. 29-30).  When he started to have an episode, he would try to use different coping
mechanisms, and he had counseling sessions about once a month.  (Tr. 30).  He last had a
depressive episode after he was in family court for a custody dispute over his children and their
length would vary.  (Tr. 30-32).  He explained that his medication prevented him from fully
expressing his emotions and, as a result, he would usually "shut down."  (Tr. 31-32).  Physically,
his ankle caused him pain when walking, and he had back pain, had a seizure, and was forced to
live a less active life than before.  (Tr. 33-34).  He thought the seizure also caused him to have

18

difficulty concentrating and remembering.  (Tr. 34).  He could take care of his personal hygiene.

(Tr. 35).  He could also take care of household chores and prepare food, but he was not able to

go shopping because of the walking required.  (Tr. 35-36).  He spent most of his time sitting with

his grandmother and watching televisions or reading when it was quiet.  (Tr. 36).  He did not go

out with others much because he feared he would get his grandmother sick with COVID.  *Id.*

Wassam described his typical day as waking up, taking care of his grandmother,

watching some television with her, tidying up the house, taking a nap, and, after putting his

grandmother to bed, doing any other household chores.  (Tr. 37-38).  He expressed a fear that

returning to work would harm his mental health, potentially causing him to return to self-

destructive conduct.  (Tr. 39).  He still had depressed feelings and, if other family watched his

grandmother, he would just remain in bed.  (Tr. 40).  He identified his ex-wife and their custody

dispute as triggers, but he also admitted to avoiding strangers and public settings.  *Id.*

## III.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

## B.     Step Four: Medical Opinion Evaluation

Wassam contends that the ALJ erred in the determination of his RFC by finding the opinions of Drs. Vogelgsang and Pakeeree unpersuasive.  ECF Doc. 11 at 7-12.  Wassam argues that ALJ's rejection of Dr. Vogelgsang's opinion was based on "generalized and unfounded claims."  ECF Doc. 11 at 8.  He asserts that there was no evidence to support that Dr. Vogelgsang's opinion was merely a restatement of his complaints and the opinion was stated

in vocational terms.  *Id.*  He argues that the ALJ failed to explain how Dr. Vogelgsang's sedentary limitation was contradicted or how the daily activities contradicted his opinion.  ECF Doc. 11 at 8-9.  As to Dr. Pakeeree, Wassam contends that the ALJ's reasons "are not supported by the evidence in the record and are mostly copy-and-paste or boilerplate statements."  ECF Doc. 11 at 10-12.  The Commissioner disagrees.  ECF Doc. 12 at 14-23.  In his reply brief, Wassam reiterates his arguments.  *See generally* ECF Doc. 15.

At Step Four of SSA's sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[4].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

### 1.    Dr. Vogelgsang

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in finding Dr. Vogelgsang's opinion "unpersuasive."  42 U.S.C. § 405(g);

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

*Rogers*, 486 F.3d at 241.  Here, the ALJ addressed both of the factors required under 20 C.F.R. § 404.1520c(b)(2).  As to inconsistency, the ALJ explained that she considered Dr. Vogelgsang's opinion to be inconsistent with the benign diagnostic and clinical findings, Wassam's post-surgical improvement and conservative treatment, and his daily living activities.  *See* 20 C.F.R. § 404.1520c(c)(2); (Tr. 128).  Wassam contends that the ALJ's analysis failed to build a logical bridge in explaining her decision, specifically failing to explain her references to "benign diagnostic and clinical findings" and Wassam's daily activities, and her rejection of the doctor's sedentary limitation.  *See* ECF Doc. 11 at 9.  But we do not review the ALJ's explanation in isolation.  Rather, we examine the ALJ decision as a whole.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

From this broader perspective, the ALJ's wording provided an adequate reference back to her summary of the evidence for a reader to understanding the justifications behind her findings.  In her summary of the physical evidence, the ALJ noted a variety of objective records and treatment notes indicating mild impairments resulting from Wassam's ankle fractures, such as normal physical examination results from Dr. Guran.  (*See* Tr. 125-126).  Although citations may have been an advisable addition, the regulations do not require the ALJ to provide a specific level of detail or a certain number of administrative record citations in the discussion and evaluation of a medical source opinion.  *See* 20 C.F.R. § 404.1520c.  Further, the ALJ's summary noted Wassam's specific daily activities.  (*See* Tr. 124-126).  With this summary only a few pages before her discussion of the opinion evidence, it was reasonable for the ALJ to refer back to it by merely referencing Wassam's conduct while caring for his grandmother.  Such references do not hinder a common-sense reading of the ALJ's decision and, accordingly, I find

that the ALJ built a logical bridge between the evidence and her decision to find

Dr. Vogelgsang's opinion inconsistent with the evidence. *See Fleischer*, 774 F. Supp. 2d at 877.

Wassam may disagree with the ALJ's assessment of the evidence, but as long as the ALJ's

explanation is understandable and supported by substantial evidence, as will be discussed below,

the decision should be affirmed. *See* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

Further, the ALJ addressed the supportability of Dr. Vogelgsang's opinion, finding it was

a restatement of Wassam's complaints, uncertain, vague, and not articulated in vocational terms.

*See* 20 C.F.R. § 404.1520c(c)(1); (Tr. 128). Wassam asserts that there is no evidence that

Dr. Vogelgsang's opinion merely restated his complaints or failed to provide the opinion in

vocational terms. *See* ECF Doc. 11 at 8. Although the ALJ did not indicate what portions of

Dr. Vogelgsang's opinion she believed were restatements, those portions that related functional

limitations, such as lifting or sitting limitations, are generally contained in a section of the

opinion replete with references to Wassam's self-evaluation. (Tr. 1352-1353). Intermixed with

statement like "[h]e can carry and lift about 25 pounds" are statements like "[h]e does not have a

license to drive a car," which are clearly drawn from Wassam. (*See* Tr. 1353). More revealing,

however, is that these statements are under a heading for the history of Wassam's present illness

and not in Dr. Vogelgsang's review of Wassam's symptoms or physical examination notations.

(*See* Tr. 1352-1355). The few statements not within this section, as discussed below, were so

full of Dr. Vogelsang's caveats and qualifiers that they were too vague to rely on. (*See*

Tr. 1356). As a result, it was reasonable for the ALJ to determine that the more specific

statements on functional limitations in the "History of Present Illness" section represented what

Wassam reported rather than what Dr. Vogelgsang concluded.

23

Likewise, the ALJ's other findings about the supportability of Dr. Vogelgsang's opinion were adequately explained and supported by the records.  The ALJ found that Dr. Vogelgsang's opinion was "uncertain, vague, and not articulated in vocational terms."  (Tr. 128).  And it was.  Dr. Vogelgsang's opinion was full of caveats regarding Wassam's functional limitations, stating Wassam "probably would have" a difficult time standing or walking for extended periods of time and he "may be able to do a sedentary job."  (Tr. 1356).  Further, aside from the above statements, Dr. Vogelgsang's opinion was not stated in vocational terms.  (*See* Tr. 1352-1357).  Accordingly, the ALJ reasonably concluded that the doctor's opinion was not supported either by his own explanation or the objective medical evidence.  *See* 20 C.F.R. § 404.1520c(c)(1).

Moreover, substantial evidence supported the ALJ's determination.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (1) post-surgical records indicating Wassam was sore but not otherwise impaired, (Tr. 1514); (2) records indicating his osteoarthritis did not substantially limit his ability to walk or his range of motion, (Tr. 532, 559, 1368, 1378, 1536); (3) Wassam's report to Dr. Guran that his medication and topical cream helped relieve pain, (Tr. 1619); and (4) Wassam's assessment that he could perform household chores and walk three blocks, (Tr. 35-36, 257).  *See Biestek*, 139 S. Ct. at 1154.  Moreover, as discussed above, Dr. Vogelgsang's opinion reflected the concerns the ALJ noted in finding it unsupported.  (*See* Tr. 1352-1357).  Because the ALJ's decision was supported by substantial evidence, it was within the Commissioner's "zone of choice."  *See Mullen*, 800 F.2d at 545.  The ALJ's findings regarding Dr. Vogelsang should be affirmed.

### 2.    Dr. Pakeeree

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in finding Dr. Pakeeree's opinion "mostly unpersuasive."  42 U.S.C.

§ 405(g); *Rogers*, 486 F.3d at 241.  Under the regulations, the ALJ was obligated to discuss at least the opinion's supportability and consistency.  *See* 20 C.F.R. § 404.1520c(b)(2).  And she did.  The ALJ explained that she found Dr. Pakeeree's opined limitations mostly inconsistent with his own treatment notes and other records, citing Dr. Pakeeree's notation of unremarkable symptoms and lack of mental disturbances, and with Wassam's daily activities, specifically noting his caregiving.  (Tr. 128).  Further, the ALJ explained that Dr. Pakeeree's opinion was unsupported because it consisted of a general listing of Wassam's diagnoses and subjective allegations, with little explanation or supporting evidence.  *Id.*  Consequently, the ALJ addressed the required factors of consistency and supportability.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Wassam contends that the ALJ's discussion of Dr. Pakeeree's opinion was insufficient because it was merely a boilerplate recital of the law, copy-and-pasted explanations, or wrong. ECF Doc. 11 at 10-12.  As to his first two assertions, Wassam calls the ALJ's statement that the record lacked evidence of hallucinations, delusions, obsessions, etc. "copy-and-paste or boilerplate," citing other social security cases using the same phrasing.  *See* ECF Doc. 11 at 10-11.  This argument has three flaws.  First, the ALJ's articulation was far from barebones or mere boilerplate.  Although the ALJ may not have provided the level of detail Wassam desired, she identified examples of where she found the evidence inconsistent with Dr. Pakeeree's opinion.  This provided a sufficient explanation, in light of the ALJ's summary of the evidence, to allow a subsequent reviewer to consider the ALJ's citations and review her findings.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  Moreover, the record shows that the ALJ engaged with Dr. Pakeeree's opinion because she relied on it in her discussion of the mental health medical listings.  (*See* Tr. 123).

Second, the ALJ's statement was not an impermissible use of boilerplate phrasing. Unlike other instances where the court has found that the ALJ improperly relied *exclusively* on a boilerplate explanation, here, the ALJ's use of standard language to describe the lack of evidence in the record was only a portion of her overall analysis, and it did not cause a concern that the ALJ failed to review the record. *See Thomas v. Comm'r of Soc. Sec.*, No. 1:20-cv-1659, 2021 U.S. Dist. LEXIS 293241, at *22-28 (N.D. Ohio Sept. 29, 2021) (recommending remand based on the ALJ's boilerplate statement that the plaintiff's subjective symptoms complaints were inconsistent without more was insufficient to allow meaningful review), *adopted* 2021 U.S. Dist. LEXIS 202642, (N.D. Ohio Oct. 20, 2021).  And third, because the ALJ's phrasing appears in other cases does not undermine the legitimacy of her reasoning in this case.  Thus, while an ALJ always could add more detail, the ALJ's articulation in this case was far from a barebones, boilerplate description because she provided specific reasons for her findings.  And those reasons were sufficient to satisfy the regulations.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

As to Wassam's assertion that the ALJ's supportability analysis was wrong, such a contention requires us to determine whether substantial evidence supported the ALJ's finding.  I find that it does as to both factors.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (1) Wassam's prison mental health records that indicated a generally stable condition, (Tr. 359-600); (2) Dr. Pakeeree's observations of generally appropriate mood and affect, without any delusions, hallucinations, or evidence of dangerousness, (Tr. 1348-1349, 1364, 1414-1415, 1459-1460); (3) Wassam's functional analysis that he could follow written instructions, got along with authority figures, and could handle most stress well, (Tr. 258-259); and (4) Wassam's testimony that he cared for his grandmother and would read or do puzzles, (Tr. 22-23).  *See Biestek*, 139 S. Ct. at 1154.

26

Specifically as to supportability, the ALJ's finding was also supported by substantial evidence as Dr. Pakeeree never cited any objective medical testing or substantive explanation for his opined limitations. *See Biestek*, 139 S. Ct. at 1154; (Tr. 1339-1341, 1624-1628). Rather, Dr. Pakeeree relied on generalized statements that "[w]ith [the] patient's disability, i.e. Bipolar disorder, and with the physical problems that patient has, e.g. chronic pain e.g. in ankles, and [] multiple psych meds that the patient is on, I do not feel that the patient can withstand the stress of the work environmen[t]." (Tr. 1624). Because substantial evidence supported the ALJ's finding that most of Dr. Pakeeree's limitations were inconsistent with the evidence, the ALJ's decision fell within the Commissioner's "zone of choice," which may not be second-guessed by the court. *See Mullen*, 800 F.2d at 545. Thus, the ALJ's decision should be affirmed.

## IV. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Wassam's applications for DIB and SSI be affirmed.

Dated: June 7, 2022

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).